IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BENJAMIN APPLEBY,

              Petitioner,

v.

                                           Case No. 15-3038-JTM

SAM CLINE, ET AL.,

              Respondents.

## MEMORANDUM AND ORDER DENYING HABEAS PETITION

This matter comes before the court on Benjamin Appleby's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Dkt. 1), Respondents' Answer and Return (Dkt. 16), and the relevant state court records (Dkt. 17). Appleby, through counsel, alleges numerous grounds for relief, including ineffective assistance of counsel, evidentiary errors, a jury instruction error, and a sentencing error. For the reasons set forth below, the court concludes that Appleby is not entitled to federal habeas corpus relief and denies the petition.

## I.    Federal Habeas Standards

### A.  Generally

A federal court reviews a state prisoner's challenge to matters decided in state court proceedings pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which "requires federal courts to give significant deference to state court decisions" on the merits. *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013). A federal court may not grant a state prisoner habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established law" refers to the Supreme Court's holdings, as opposed to its dicta. *Lockett*, 711 F.3d at 1231. A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quotations omitted). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

### B.   Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show both that his counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Failure under either prong is dispositive. *Id.* at 697. In reviewing counsel's performance, courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011). "To be deficient, the performance must be outside the wide range of professionally competent assistance. In other words, it must have been completely unreasonable, not merely wrong." *Id.* (internal quotations and citations omitted). Petitioner bears a heavy burden of overcoming the presumption that counsel's actions were sound trial strategy. *Id.* This burden increases doubly at the § 2254 proceeding level as federal courts defer not only to the attorney's

decision in how to best represent a client, but also to the state court's determination that counsel's performance was not deficient. *Id.*

## II.    Factual and Procedural History

The court presumes the state court's factual determinations are correct, unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Appleby has not proffered any evidence in support of that burden. Thus, the court adopts the following facts as taken from the Kansas Supreme Court's ("KSC") opinion affirming his conviction.

On June 18, 2002, A.K. was murdered while working alone as an attendant at a swimming pool near her family's home. Her brother, who also worked as a pool attendant, arrived at the pool around 5 p.m. to relieve A.K. after her shift ended, but he could not find her. He called their father, R.K., who came to the pool and searched for his daughter. Around 5:30 p.m., R.K. found A.K. in the pool's pump room, lying face down under a pool cover. She had been severely beaten, her face was battered and bloody, and her hair was matted with blood. A.K. was naked from the waist down, her sports bra had been pushed up under her arms, and her T-shirt was wrapped tightly around her neck.

Soon after this tragic discovery, police arrived and secured the pool area. In doing so, an officer recorded the name of everyone present at the scene, including a "Teddy Hoover" who was later identified as Appleby. The police also secured evidence, some of which was tested for DNA. This testing revealed DNA that did not match A.K.'s. Few other leads developed from the initial investigation.

An autopsy led to the conclusion that A.K.'s death was caused by strangulation and multiple blunt force injuries, although the strangulation would have been enough to kill A.K. Dr. Michael Handler—the forensic neuropathologist who performed the autopsy and who is board certified in anatomic pathology, neuropathology, and forensic pathology—concluded there had been both ligature and manual strangulation. According to him, it would have taken approximately 10—and perhaps as many as 16—minutes for the assailant to strangle A.K. Because there was petechial hemorrhaging, Dr. Handler believed there were periods when the force of strangulation was stopped.

Dr. Handler also identified other injuries, which made it appear A.K. had been in a horrible fight. Both of her eyes were blackened, her lip was cut, and her arms were bruised and scraped. A.K.'s hands, especially the knuckles and fingers, were cut, and the fingers on her left hand were contorted and broken. A.K. also had

bruises on her face and both hip bones, knees, feet, and upper thighs. There were two lacerations on the back of A.K.'s head, which could have been caused by a fall or by someone beating her head against the floor.

Several months after A.K.'s death, Sergeant Scott Hansen of the Leawood Police Department went to Appleby's home in Kansas City, Kansas. At that point in time, the police knew Appleby by his alias of Teddy Hoover. Appleby agreed to speak with Sergeant Hansen and indicated that he was a self-employed pool maintenance contractor. Hansen requested a DNA elimination sample from Appleby, who said he would talk to his attorney about providing a sample. When Hansen tried to follow up later, he discovered that Appleby had left town.

Subsequent leads caused police to seek more information from Appleby, who they still knew as Teddy Hoover. In November 2004, the investigation led Kansas detectives to Connecticut, where Appleby was living. Connecticut State Police discovered an outstanding arrest warrant for Appleby from 1998 and agreed to execute the warrant when Kansas detectives could be present. The purpose of this arrest was to give Kansas detectives an opportunity to question Appleby.

After Kansas detectives arrived in Connecticut, they worked with Connecticut officers to prepare and obtain search warrants that authorized a search of Appleby's house and the swabbing of Appleby's mouth for the purpose of obtaining a DNA sample. Then, Connecticut police arrested Appleby at his home and executed the residential search warrant.

While the search warrant was being executed, Appleby was transported to a nearby Connecticut police station by Connecticut Detective Daniel Jewiss. On the way, Appleby volunteered that after some "trouble" in his past, he had taken on the name of his childhood friend, Teddy Hoover, who had died in an accident.

At the police station, Detective Jewiss started processing Appleby on the Connecticut arrest warrant. During the book-in process, another detective from Connecticut's major crime unit executed the search warrant that allowed swabbing Appleby's inner mouth for purposes of DNA testing. As we will discuss in more detail as part of our analysis of the second issue, when served with the DNA search warrant Appleby asked if he could speak to an attorney regarding his right to refuse the swabbing and, at three other points during the book-in process, asked whether he would have a chance to talk to an attorney. Appleby was told he did not have a right to refuse the execution of the warrant allowing the DNA swabbing but was told he would have the opportunity to call an attorney.

After completing most of the book-in process, Detective Jewiss told Appleby that other detectives wanted to speak to him about "an unrelated matter" and asked if Appleby was willing to talk to them. Appleby agreed and was taken upstairs to an interrogation room where the Kansas detectives waited. The detectives asked Appleby if he would answer some questions about A.K.'s murder. Up to this

point, Appleby had not been told that Kansas detectives were involved or that some of the warrants were related to the A.K. murder investigation.

Appleby told the Kansas detectives he wanted to speak with them and straighten out some details from the time Sergeant Hansen interviewed him at his home in Kansas City. After being Mirandized, Appleby told the Kansas detectives that while he lived in Kansas City he used the name Teddy Hoover and had a pool company named Hoover Pools. Appleby indicated that he moved to Texas shortly after his interview with Sergeant Hansen and went back to using his real name, Benjamin Appleby; then he moved to Connecticut.

The detectives repeatedly asked Appleby if he had been at the pool where A.K. died, but Appleby told them he had never been there. After approximately 1 hour, the detectives moved him to an adjoining interview room. The second room contained items from the police investigation, such as a time line of the investigation, A.K.'s photograph and obituary, an aerial photograph of the pool, a videotape, a notebook labeled with the name Teddy Hoover, and two additional notebooks labeled as crime scene and autopsy photographs. The detectives then confronted Appleby with the fact that an officer at the pool on the day of the murder had logged the presence of a man who gave the name Teddy Hoover and a telephone number. At that point, Appleby acknowledged he had been at the pool that day.

About 15 or 20 minutes later, Appleby admitted he had killed A.K. Appleby told the detectives A.K. was in the pump room when he arrived at the pool. Finding A.K. attractive, Appleby tried to "hit on her," but A.K. rejected his advances and tried to leave the pump room. Appleby stood in her way and tried to grab her breasts and her waist. A.K. pushed Appleby and then punched him. This angered Appleby, who "lost it" and, in his own words, "just beat the shit out of her." Appleby described the ensuing struggle during which the two fell and Appleby hit A.K. twice in the back of the head, which rendered her unconscious. Then he straddled A.K. and removed her shorts and panties, intending to have sex with her. Appleby next stood up and found a first-aid kit stored in the pump room. From the kit, the defendant said he took a tube of ointment and used the ointment as a sexual lubricant, but he could not obtain an erection.

Appleby also admitted to strangling A.K., although he told the detectives he could not remember what he used. At one point, Appleby suggested he used the rope on the pool thermometer in the pump room. At other times he stated he did not remember strangling A.K.

In describing what happened next, Appleby stated that as he was leaving, he thought he heard A.K. breathing and "didn't want to leave her that way," so he covered her up with the pool cover. He then left as a young woman drove up and honked a horn. He waved, got into his truck, and left. Appleby returned to the

pool later, about 5:30 p.m., because he wanted to see what had happened; as a result, he was on the scene when the police created the crime scene log.

DNA testing performed by two crime labs matched Appleby's DNA to the DNA found mixed with A.K.'s DNA on the ointment tube and on her sports bra and T-shirt. In addition, Appleby was linked to the crime by the young woman who pulled up as Appleby was leaving the pool; she identified him as the man she saw.

The State charged Appleby with capital murder for the death of A.K. (Count I), under K.S.A. 21–3439(a)(4) (intentional premeditated killing in the commission of or subsequent to the offense of attempted rape), and attempted rape (Count II), under K.S.A. 21–3301 and K.S.A. 21–3502. The jury found Appleby guilty of both charges. The trial court imposed a hard 50 life imprisonment sentence for the murder conviction and a consecutive sentence of 228 months' imprisonment for the attempted rape conviction.

*State v. Appleby*, 289 Kan. 1017, 1021-25 (2009).

Appleby appealed his convictions, raising the following issues: 1) his convictions were multiplicitous and his punishment for both crimes violated the double jeopardy clause; 2) the trial court erred by admitting into evidence the incriminating statements he made to Kansas detectives; 3) the trial court erred by admitting into evidence a computer-generated report regarding population statistics on DNA testing; and 4) the jury instruction defining "premeditation" did not direct the jury on how to apply the evidence or unduly emphasized the State's case. On November 20, 2009, the Kansas Supreme Court affirmed the capital murder conviction and Hard 50 sentence, but vacated the attempted rape conviction and the correlating sentence as multiplicitous. *Id.*

On October 4, 2010, Appleby filed a motion for post-conviction relief under Kan. Stat. Ann. § 60-1507 in the District Court of Johnson County, Kansas ("the 1507 Motion"). On August 1, 2012, that court denied that motion. The Kansas Court of Appeals ("KCOA") affirmed that decision on February 28, 2014, and the KSC denied review. *Appleby v. State*, No. 108,777, 2014 WL 801921 (Kan. Ct. App. 2014), review denied (Feb. 25, 2015).

On February 25, 2015, Appleby filed this habeas petition, alleging seven grounds for relief. Respondents urge denial of habeas relief because Appleby cannot demonstrate any constitutional errors or that the state court decisions failed to comport with clearly established federal law.

## III.    Analysis

Because both parties recite the state court decisions at length, the court will not repeat them except as necessary to the analysis.

### A.   Ineffective Assistance of Counsel (Grounds 1-3)

Appleby alleges his trial attorneys provided ineffective assistance three different ways. The KCOA rejected all three claims, finding trial counsels' performance was not deficient. Appleby now argues that the KCOA's decision was based on an unreasonable determination of the facts in light of the evidence presented and an unreasonable application of *Strickland.*

### 1.      Failing to Call Expert to Raise Mental Defect Defense at Trial

Appleby maintains his attorneys were ineffective for failing to call Dr. George Hough to present a defense of mental disease or defect at trial. Appleby argues that Dr. Hough's testimony would have provided evidence that he suffered from intermittent explosive disorder, which would have negated the State's theory of premeditation. The KCOA concluded that counsels' decision not to call Dr. Hough constituted permissible trial strategy. *Appleby v. State*, 318 P.3d 1019, *10 (Feb. 28, 2014). Appleby contends the state district court's conclusion overlooked Dr. Hough's testimony at sentencing that his diagnosis of Appleby included intermittent explosive disorder, that Appleby's behavior was "driven by uncontrolled emotion, mainly rage" and was "manifested by such correlates as hyperarousal, a collapse of thinking or cognitive mediation,"

and that "as best as [he] can tell[, A.K's murder] was not planned or organized or rehearsed." Dkt. 2 at 22.

The court finds Appleby's arguments unavailing. First, the KCOA did not overlook that testimony. The KCOA actually recited that testimony in its opinion but concluded "a reasonable juror could have interpreted Dr. Hough's statement to mean that while Appleby did not initially think of killing A.K. when he first arrived at the pool or first became enraged, he thought about killing A.K. after the attack began but before the actually killing occurred." *Appleby*, 318 P.3d at *11. The court agrees with that assessment. Second, Appleby fails to recognize that Dr. Hough's testimony was a double-edged sword. Dr. Hough testifying at trial included the following potential dangers: 1) he also diagnosed Appleby with antisocial personality disorder, which could have outweighed the intermittent explosive disorder diagnosis; and 2) he would have refused to give a professional opinion that Appleby could not form the requisite criminal intent of premeditation. Dr. Hough even agreed with defense counsels' conclusion that his testimony would not have been helpful since he was unwilling to give that professional opinion. As the KCOA noted, "a less than favorable expert witness called by the defense can do more harm than several good witnesses can repair." *Id.* at 10. Moreover, because other evidence showed that Appleby could have formed the requisite intent, the decision to attack the State's timeline rather than present a potentially damaging witness was an objectively reasonable one. The court finds the record supports the KCOA's determination that defense counsels' decision to not call Dr. Hough at trial was reasonable.

## 2.    Failing to Call Expert to Dispute Strangulation Time

Appleby next argues that his attorneys were ineffective for failing to call Dr. Edward Friedlander to present expert testimony disputing the length of time A.K. was strangled. Dkt. 2 at

26-27. Appleby claims that Dr. Friedlander would have testified that: 1) he did not see evidence of petechial hemorrhaging, thus the strangulation time was uncertain; and 2) it would have taken three to five minutes of strangulation to cause the artifacts seen on A.K.'s body (rather than 10 to 16 minutes as the State's expert testified). The KCOA found that counsels' decision not to call Dr. Friedlander constituted permissible trial strategy. 318 P.3d at *12. The record supports this conclusion. Defense counsel Keck testified that she spent hours with Dr. Friedlander preparing for trial, he told her not to call him as a witness, he changed his opinion from two minutes to three to five minutes, and she did not believe he would hold up under cross-examination. Moreover, even if the jury accepted Dr. Friedlander's opinion that the strangulation time was three to five minutes, that remained ample time to form premeditation. Appleby's arguments focus on his disappointment in not having his own expert contradict the state's expert. But Appleby's expectations are irrelevant to whether the decision not to call Dr. Friedlander as a witness was objectively reasonable.

### 3.    Failing to Raise Suppression Issues

Appleby maintains that his attorneys were ineffective for failing to file a motion to suppress the statements he made to Kansas detectives while in custody in Connecticut on the grounds that: 1) the Connecticut arrest warrant was stale, and 2) the Kansas detectives acted outside of their territorial jurisdiction. The trial court and the KCOA concluded that the delay in executing the warrant would have been found reasonable under Connecticut law because Appleby provided Connecticut law enforcement with a false name and then fled the state for several years. As a result, the arrest warrant remained valid at the time of Appleby's arrest and any motion to suppress based on staleness would have failed. Appleby argues that this conclusion overlooks the fact that he provided Connecticut officers with the name "Hoover," his

address, and a confession. He also provided Kansas law enforcement with his "Hoover" name and his address near the crime scene. He argues that going by another name does not support any affirmative attempt to conceal his identity. He also argues that moving at some point is not evidence of fleeing to avoid apprehension. The court finds these arguments unpersuasive. These facts support an inference that Appleby was attempting to conceal his identity and to evade capture.

The state courts also rejected Appleby's extra-territorial argument, finding nothing unlawful in the Kansas detectives' actions. *Appleby*, 2014 WL 801921 at *16-18. The court agrees with the state courts' analysis of Kan. Stat. Ann. § 22-2401a. It does not prohibit Kansas officers from going out of state to interview a witness nor does it prohibit them from assisting officers in other jurisdictions in submitting affidavits for search warrants. Appleby suggests that the Kansas officers directed the timing of events, thus they controlled the Connecticut arrest and search. The court disagrees. The Kansas detectives collaborated with the Connecticut officers, but did not control the Connecticut investigation. Appleby was arrested under a Connecticut arrest warrant executed by Connecticut officers, who ultimately decided when to act. Although the Kansas detectives may have assisted Connecticut officers in applying for the search warrants and may have been present during the search, they did not lead the search. A Connecticut judge signed the search warrant and the State of Connecticut issued the warrant. The Kansas detectives did not question Appleby until after he agreed to speak with them about "an unrelated matter." The court finds the record supports the KCOA's conclusion that counsels' performance was not deficient for failing to raise these issues in a motion to suppress.

### 4.      Failing to object to testimony regarding Appleby's credibility

Appleby maintains that his attorneys should have objected to portions of the detectives' trial testimony that commented on his credibility; specifically, their comments that Appleby's explanation for returning to the crime scene was "pretty hard to believe" and "did not make sense." The KCOA concluded that trial counsels' failure to object to this testimony did not deprive Appleby of his right to a fair trial because there was no reasonable probability that objecting would have produced a different result since there was sufficient evidence that Appleby killed A.K.

A successful ineffective assistance of counsel claim requires satisfaction of two prongs: 1) performance below an objective standard of reasonableness, and 2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88. Appleby offers nothing more than a conclusory argument that these comments prejudiced his right to a fair trial. The record supports the KCOA's conclusion that the outcome would not have been different given the following evidence: 1) Appleby was present at the scene shortly after the killing; 2) Appleby's DNA was on several items found in the pump room, including A.K.'s bra, t-shirt, and the ointment tube; 3) Appleby knew details about the crime that no one else could have known; and 4) an eyewitness saw Appleby at the crime scene. Thus, the KCOA applied *Strickland*'s second prong in an objectively reasonable manner. This claim therefore does not provide a basis for federal habeas relief.

### 5.      Appellate Counsel's Failure to Raise the Above Issues

Having rejected all of Appleby's claims that his trial attorneys were ineffective, it necessarily follows that appellate counsel was not ineffective for failing to raise those issues on

direct appeal. The court finds the KCOA applied *Strickland* in an objectively reasonable manner with respect to Appleby's appellate counsel.

For these reasons, petitioner's ineffective assistance of counsel claims provide no basis for habeas relief.

**B.   Kansas Hard 50 Sentence (Ground 4)**

On direct appeal, Appleby challenged the constitutionality of the Kansas Hard 50 statute because it permits the sentencing court to find the aggravating circumstances for a Hard 50 sentence, utilizing a preponderance of the evidence standard, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The KSC rejected this challenge, stating:

> This court has repeatedly rejected similar arguments challenging the constitutionality of the hard 40/hard 50 sentencing scheme and held our hard 50 scheme is constitutional. *State v. Johnson*, 284 Kan. 18, 22-23, 159 P.3d 161 (2007), *cert. denied*, 552 U.S. 1104, 128 S.Ct. 874, 169 L.Ed.2d 737 (2008); *see also State v. Warledo*, 286 Kan. 927, 954, 190 P.3d 937 (2008) (reaffirming *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 [2000], citing *Johnson* with approval, and noting that the United States Supreme Court has not "altered decisions in which it recognized that the [*Apprendi* ] prohibition does not apply when considering the minimum sentence to be imposed"); *State v. Albright*, 283 Kan. 418, 424 153 P.3d 497 (2007). Appleby presents no persuasive reason to abandon this long line of precedent.

Appleby did not raise this challenge in the 1507 Motion and appeal.

Appleby now argues that he is entitled to federal habeas relief because his Hard 50 sentence violates *Alleyne v. United States*, 133 S.Ct. 2151 (June 17, 2013) and *State v. Soto*, 299 Kan. 102 (2014) and its progeny – all of which were decided after the KSC affirmed his convictions. He says these cases constitute an intervening change in law, which excuses any failure to raise this issue in the 1507 proceedings. Dkt. 2 at 101. He also argues that *Alleyne* is a new rule of criminal procedure that should be applied retroactively in his case because he raised

the constitutionality of the Hard 50 statute under *Apprendi* on direct appeal. *Id.* at 99-101. The court finds Appleby's arguments unpersuasive.

First, the court finds Appleby's reliance upon *Soto* misplaced. *Soto* is factually distinguishable because *Alleyne* was decided during *Soto*'s direct appeal. *Soto*, 299 Kan. at 344 (after the parties filed their initial briefs, the United States Supreme Court issued the *Alleyne* decision).

More importantly, a prisoner seeking federal habeas relief may rely on new constitutional rules of criminal procedure announced *before* the prisoner's conviction became final. *Teague v. Lane*, 489 U.S. 288, 310 (1989). Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from the United States Supreme Court has become time barred or has been disposed of. *Griffith v. Kentucky*, 479 U.S. 314, 321, n.6 (1987). The KSC affirmed Appleby's convictions on November 20, 2009. Appleby did not file a petition for writ of certiorari to the United States Supreme Court, thus his convictions and sentence became final on February 18, 2010, ninety days after the KSC decision. *See Locke v. Saffle*, 237 F.3d 1269, 1273 (10th Cir.2001) (a conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired). Because *Alleyne* was decided after his conviction became final, Appleby may not rely upon *Alleyne*. The fact that *Alleyne* is an extension of *Apprendi* does not change when the *Alleyne* rule was announced.

Appleby's argument for retroactive application of *Alleyne* lacks legal support. The Supreme Court has not made *Alleyne*'s new rule of constitutional law retroactive to cases on collateral review, and the Tenth Circuit has determined that *Alleyne* does not apply retroactively to cases on collateral review. *See In re Payne*, 733 F.3d 1027, 1029 (10th Cir. 2013). The

Supreme Court has held that rules based on *Apprendi* do not apply retroactively on collateral review, *see Schriro v. Summerlin*, 542 U.S. 348 (2004), thus it is unlikely that the Supreme Court will declare *Alleyne* retroactive in the future.

Section 2254(d)(1) requires federal courts to measure state-court decisions against the United States Supreme Court's precedents as of "the time the state court renders its decision." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (internal quotations and citation omitted). The court finds the KSC's decision a reasonable determination of the law at the time Appleby's conviction and sentence became final. Accordingly, Ground 4 provides no basis for habeas relief.

## C. Confession (Ground 5)

Appleby maintains the admission of his confession violated his right against self-incrimination under the Fifth and Fourteenth Amendment because his confession was obtained after he had unambiguously requested counsel. He argues the state court's conclusion that at the time he requested counsel, interrogation was clearly not imminent or impending, was an unreasonable application of the facts because he was interrogated minutes later by Kansas detectives. He also argues that the state court's reliance on his actions after his requests for counsel (*i.e.*, agreeing to speak to Leawood detectives, waiving *Miranda*, and talking to them for two hours without requesting counsel) to conclude that his request for counsel was ambiguous was contrary to *Smith v. Illinois*, 469 U.S. 91 (1984). Dkt. 2 at 126-27. In sum, he contends the state courts' adjudication of this claim was contrary to federal law, namely *Miranda*, *Edwards*, *Davis*, *McNeil*, *Roberson*, *Minnick*, and *Smith*.[1] The court disagrees.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *Edwards v. Arizona*, 451 U.S. 477, (1981); *Davis v. United States*, 512 U.S. 452 (1994*); McNeil v. Wisconsin*, 501 U.S. 171 (1991); *Arizona v. Roberson*, 486 U.S. 675 (1988); *Minnick v. Mississippi*, 498 U.S. 146 (1990); and *Smith v. Illinois*, 469 U.S. 91 (1984).

The KSC's analysis was comprehensive and consistent with federal law. The KSC followed *Davis v. United States*, 512 U.S. 452 (1994), when it rejected Appleby's invitation to give broad effect to any mention of counsel by a suspect. *Appleby*, 289 Kan. at 1039-41. *Davis* requires suspects to unambiguously request counsel for the purpose of assisting with custodial interrogation. Thus, as the KSC concluded, the trial court was correct in examining the circumstances surrounding the request to determine whether Appleby's questions were unambiguous requests for the assistance of counsel with custodial interrogation.

The KSC then examined and followed the tenets set out in *McNeil v. Wisconsin*, 501 U.S. 171 (1991) and *Montejo v. Louisiana*, 556 U.S. 778 (2009). In *McNeil*, the Supreme Court distinguished the Sixth Amendment right to counsel from the Fifth Amendment right recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court held that an accused's invocation of his Sixth Amendment right to counsel during a judicial proceeding does not constitute an invocation of the Fifth Amendment right to counsel. *McNeil*, 501 U.S. at 171. The Supreme Court explained that "[t]o invoke the Sixth Amendment interest is, as a matter of *fact*, *not* to invoke the *Miranda-Edwards* interest." *Id.* at 178 (italics in original). The Supreme Court further explained that an invocation of the Fifth Amendment right "requires, at a minimum, some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.*

In *Montejo*, the Supreme Court summarized Fifth Amendment jurisprudence: 1) any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right; 2) once such a defendant "has invoked his right to have counsel present," interrogation must stop; and 3) no subsequent interrogation may take place until counsel is present, "whether or not the accused has consulted with his attorney." *Montejo*, 556

U.S. at 794 (citing *Miranda*, 384 U.S. at 474; *Edwards*, 451 U.S. at 484; *Minnick*, 498 U.S. at 153). The Supreme Court stressed that "[w]hat matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation." *Id.* at 797. The Supreme Court also noted that it "had never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial investigation." *Id., citing McNeil*, 501 U.S. at 182, n.3.

Applying these tenets, the KSC concluded that "Appleby's references to an attorney during the book-in process on the Connecticut charges did not constitute a clear and unambiguous assertion of his Fifth Amendment right as protected by *Miranda*." 289 Kan. at 1052. The record supports the trial court's conclusion that Appleby clearly requested an attorney, but he did not make it clear he wanted the attorney to assist with questioning rather than assistance with his case. Appleby made four requests for counsel. The request made in response to the DNA swabs was clearly not related to custodial interrogation. The other three requests were more general. He made them before or during the book-in process. At that time, Appleby only knew of the Connecticut case. No one had told Appleby that his arrest was connected to the murder of A.K. Detective Jewiss told Appleby that he would not be questioning him. These facts support the KSC's conclusion that when Appleby made his requests, interrogation was not imminent or impending. *Appleby*, 289 Kan. at 1052. The fact that a custodial interrogation took place minutes later does not make this conclusion unreasonable.

Finally, the trial court did not rely solely on Appleby's post-request responses to reach the conclusion that his requests for counsel were ambiguous. Events preceding the requests, the timing as well as the content and context of his reference to counsel supported the court's conclusion as to ambiguity. Appleby's post-request responses provided further support.

The court finds the KSC applied a legal standard consistent with federal law and applied it in an objectively reasonable manner. Thus, Ground 5 fails as a basis for habeas relief.

### D.   DNA Population Study (Ground 6)

Appleby maintains the admission into evidence of a computer-generated report containing statements regarding population statistics on DNA testing violated his right to confrontation under the Sixth Amendment and was contrary to or an unreasonable application of *Crawford v. Washington*, 541 U.S. 36 (2004). The KSC rejected this argument after determining that the population frequency data, the statistical programs used to make that data meaningful, and the DNA itself are nontestimonial. The experts developed their personal opinions from these data and were available for cross-examination, thus Appleby was able to confront the witnesses. The court finds the KSC's analysis comports with federal law. The Confrontation Clause bars the introduction of testimonial hearsay against a criminal defendant, unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. *Id.* at 53-54. Because the nature of the challenged information is nontestimonial, the KSC's determination on this issue was not legally unreasonable. Thus, Ground 6 fails as a basis for habeas relief.

### E.   Jury Instruction on Premeditation (Ground 7)

Appleby argues that the jury instruction on premeditation (Instruction No. 16) violated his Fourteenth Amendment right to a fair trial because it unfairly emphasized the State's theory of premeditation. Appleby challenges the italicized language that was added to the pattern jury instruction:

> Premeditation means to have thought the matter over beforehand. In other words, to have formed the design or intent to kill before the killing. *Stated another way, premeditation is the process of thinking about a proposed killing before engaging in the act that kills another person, but premeditation doesn't have to be present before a fight, quarrel, or struggle begins.* There is no specific time period required for premeditation, but it does require more than the instantaneous,

intentional act of taking another person's life. *Premeditation can occur at any time during a violent episode that ultimately causes the victim's death*. (Emphasis added.)

Appleby, however, concedes the italicized statements are correct statements of Kansas law. Dkt. 2 at 176.

A federal habeas court can set aside a state conviction based on an erroneous instruction only when the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Petitioner bears the burden of proving that an erroneous instruction was so prejudicial and so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (to overturn state conviction petitioner must establish not merely that instruction is undesirable, erroneous or even "universally condemned," but that it violated constitutional right). In reviewing the instruction, the court considers the instruction in the context of the trial record and the instructions as a whole. *Cupp v. Naughten,* 414 U.S. 141, 147 (1973).

The court finds Petitioner's arguments conclusory and insufficient to establish a constitutional violation. The challenged instruction correctly stated Kansas law and did not tell the jury how to apply the evidence. The Kansas Supreme Court reasonably found that viewed in the light most favorable to the prosecution, the evidence supported a conviction for premeditated murder. *Appleby*, 289 Kan. at 1064. On this record, the allegedly erroneous instruction did not so infect the entire trial as to deprive defendant of his constitutional rights. *Estelle*, 502 U.S. at 72. Accordingly, Appleby is not entitled to habeas relief on this ground.

## IV.     Evidentiary Hearing

The court finds no need for an evidentiary hearing. *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record."); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## V.   Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, the movant must demonstrate that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Saiz v. Ortiz*, 392 F.3d 1166, 1171 n. 3 (10th Cir. 2004) (*quoting Tennard v. Dretke*, 542 U.S. 274, 282 (2004)). While a movant is not required to demonstrate that his appeal will succeed to be entitled to a COA, he must "prove something more than the absence of frivolity or the existence of mere good faith." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003) (quotation omitted). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* at 336. The rulings made above are not the type that reasonable jurists could debate or would conclude were wrong. Therefore, the court declines to issue a certificate of appealabilty for this Order.

**IT IS THEREFORE ORDERED** this 27th day of December, 2016, that Appleby's petition for habeas corpus relief (Dkt. 1) is **DENIED**.

s/   J. Thomas Marten
Chief United States District JUDGE